671 F.2d 935
 17 ERC 1649, 12 Envtl. L. Rep. 20,717
 RICHLAND PARK HOMEOWNERS ASSOCIATION, INC., Richland Park
Estates Homeowners Association, Inc. and
Whispering Hills Homeowners Association
of Dallas, Inc., Plaintiffs-Appellants,
v.
Samuel R. PIERCE, Jr., Secretary of Housing and Urban
Development, et al., Defendants-Appellees.
 No. 81-1282.
 United States Court of Appeals,
Fifth Circuit.
 April 2, 1982.
 
 Besing & Armstrong, Ray G. Besing, F. Dean Armstrong, Dallas, Tex., for plaintiffs-appellants.
 Cheryl B. Wattley, Asst. U. S. Atty., Dallas, Tex., for defendants-appellees.
 Freytag, Marshall, Beneke, Laforce, Rubinstein & Stutzman, Roger D. Marshall, Roxanne Armstrong, Charles R. McConachie, Dallas, Tex., for intervenor-defendant-appellee Walnut Place, Ltd.
 Appeal from the United States District Court for the Northern District of Texas.
 Before CLARK, Chief Judge, RUBIN and TATE, Circuit Judges.
 TATE, Circuit Judge:
 
 
 1
 The plaintiffs brought this suit to obtain declaratory and injunctive relief to prevent the United States Department of Housing and Urban Development ("HUD") from providing federal financial assistance for the construction and operation of a certain low-income apartment project in Dallas, Texas. The plaintiffs alleged that, in approving federal financing for the apartment project, HUD violated procedures mandated by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and by administrative law. The plaintiffs are associations of residential property owners in the neighborhood of the apartment project.
 
 
 2
 After extensive discovery, the district court granted a summary judgment in favor of HUD.[1] The plaintiffs appeal. We affirm. In view of the completion and occupancy of the subsidized apartment project, and noting that there is no showing that HUD acted in bad faith, we find that the plaintiffs are not entitled to the post-completion equitable relief sought, even though HUD may in two minor respects have failed to comply with certain NEPA-related procedures.
 
 I. The Factual Background
 
 3
 The essential facts are undisputed. The plaintiffs are incorporated homeowners' associations whose shareholders own residential real estate in the immediate vicinity of the project. This area is in what is described as a rather "posh" residential suburb, and the factual showing is open to the interpretation that the homeowners represented by the plaintiffs mostly oppose the project because they fear that the low-income residents of the project will cause a material degradation of their neighborhood "environment."
 
 
 4
 HUD agreed to finance the project in question pursuant to section 8 of the National Housing Act of 1934, as amended by the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f (the "Act"). The purpose of the Act is "to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income...." 42 U.S.C. § 1437. In accordance with the Act and relevant regulations, in December, 1980, the HUD Dallas area office issued a Notice of Funds Available ("NOFA") for federally subsidized multi-family housing under the Section 8 Lower Income Housing Assistance Program. See 42 U.S.C. § 1437f. The NOFA, which is analogous to a request for bids, solicits applications for project proposals.
 
 
 5
 Under the section 8 program, HUD provides developers with certain permanent financing consideration and mortgage insurance. The developers, in turn, reserve 20% of the apartment units in the subsidized project for qualified lessees with low or very low incomes. These low income tenants pay no more than 25% of their monthly income for rent, and HUD pays the developer-owner the remainder of the fair market value rent.
 
 
 6
 Pursuant to HUD regulations adopted in response to NEPA, HUD must assess the environmental effects of a proposed project before the project is accepted for section 8 subsidization. See 24 C.F.R. §§ 50.20 et seq. The regulations establish a two-level environmental clearance procedure. First, an environmental assessment is prepared. Depending on the magnitude of the proposal, the assessment will be either a normal environmental clearance ("NEC") or, for larger proposals, a more-detailed special environmental clearance ("SEC"). Second, based on the facts gathered and analyzed in the NEC or SEC, HUD decides whether an environmental impact statement ("EIS") must be prepared prior to the decision to approve or reject the proposed project. An EIS is a much more detailed public statement regarding the proposed action. NEPA mandates the preparation of an EIS if the proposal is determined to be a "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c).
 
 
 7
 In response to the December 1980 NOFA, Landmark Properties, Inc. (the "developer"),[2] submitted a proposal for a 280 unit multi-family apartment complex on the subject site. Under this first proposal, 56 units were to be reserved for low income tenants under the section 8 program.
 
 
 8
 In February 1980, HUD appraiser Gene Hollinsworth conducted a preliminary environmental analysis of the developer's proposal. Hollinsworth studied the proposal, and he conducted a field investigation. Hollinsworth recommended that the proposal be rejected, because: 1) the site sided a railroad track and exceeded acceptable noise level, 2) the site had two open ditches across it for storm drainage, and 3) the proposed density (approximately twenty apartment units per acre) exceeded the density of "typical insured projects."
 
 
 9
 After its initial proposal was rejected, the developer commissioned a noise consulting firm to do a noise study on the subject site. Taking HUD's comments and the noise consultant's recommendations into account, the developer submitted a revised proposal on April 7, 1980.
 
 
 10
 HUD assigned Carol Wakeman, another appraiser, to evaluate the revised proposal. Wakeman reviewed the revised plans, the noise study, a flood hazard boundary map, and city engineering maps for water and sanitary sewer service. She also made a field inspection of the site and the surrounding neighborhood, and she discussed with a city engineer the question whether the project might cause any problem with respect to the storm drainage easements. Based on these inquiries, Wakeman concluded that the revised proposal was "acceptable subject to (completion of required environmental analysis), soils and engineering studies, and noise attenuation for office building (which was to be located much closer to the railroad tracks than the apartment units)."
 
 
 11
 In May 1980, after HUD had received a recommendation for favorable consideration of the project from the North Texas Council of Governments (which had invited comment from the city of Dallas, the Dallas independent school district, and the Richardson school district), HUD gave the proposal preliminary approval. In August 1980, Wakeman was instructed to complete her environmental clearance. Unaware that an SEC was required due to the magnitude of the proposal, Wakeman completed an NEC. After consulting with a number of city officials and reviewing the accumulated material, Wakeman recommended "Acceptance subject to soils test and engineer's study." She concluded that no EIS would be required because the project was "not a major Federal action significantly affecting the quality of the human environment."
 
 
 12
 On September 29, 1980, HUD and the developer entered into contracts whereby the developer agreed to construct a 220 unit apartment complex. The agreements required HUD to 1) provide subsidy payments for 44 units for twenty years; 2) provide mortgage insurance; and 3) enable the developer to obtain a permanent financing commitment from the Government National Mortgage Association ("GNMA").
 
 
 13
 In October 1980, Wakeman learned that she was erroneous in her belief that only an NEC was required for environmental clearance of the project. After learning that the regulations required an SEC, she and another HUD environmental official again inspected the site. The two consulted with city officials and made all the more-detailed environmental inquiries required for the SEC. Based on the information gathered in April, August, and October, Wakeman reaffirmed her earlier conclusions that the proposal should be approved and that no EIS would be required. The developer began construction of the project shortly thereafter.
 
 
 14
 The homeowners represented by the plaintiffs began their efforts to oppose the project in September 1980. The plaintiffs filed their original complaint in the present case on November 13, 1980. The complaint asked the court to "set aside" HUD's finding that the project would have no significant environmental impact. The complaint, in addition, asked for a declaratory judgment that HUD had failed to comply with NEPA, and for attorney's fees. Significantly, the plaintiffs did not ask for preliminary or permanent injunctive relief.
 
 
 15
 The plaintiffs did move for injunctive relief in March 1981, when the plaintiffs filed an amended complaint raising some new legal claims. However, the only injunctive relief asked for was that HUD be enjoined from financially assisting the project and providing rent subsidies. The plaintiffs did not seek to enjoin construction of the project. In fact, neither the developer nor the construction company hired by the developer were joined by the plaintiffs as parties to this litigation. (Subsequently, the developer voluntarily intervened as a defendant.)
 
 
 16
 On May 29, 1981, without assigning written reasons, the district court granted the defendant HUD's motion to dismiss, or in the alternative for summary judgment, which the court treated as a motion for summary judgment. The plaintiffs filed a motion for an expedited appeal, which we denied, but they did not request any form of interim relief pending appeal.
 
 
 17
 By the fall of 1981, the project was completed and all of the construction draws, less the routine ten-percent retainage, had been paid. HUD began its rental assistance payments when the first of the 44 low-income families moved into the apartment complex. At oral argument before this court in December 1981, it was stated without dispute that all 220 units in the apartment complex, including the 44 low-income units, were occupied. Despite the completion and occupancy of the apartment complex, the plaintiffs continue to insist that HUD's allegedly improper approval of federal subsidization should be "set aside." We disagree.
 
 
 18
 II. The Issues Raised and Remedy Sought by This Appeal
 
 
 19
 We have extensively summarized the factual background to demonstrate the context in which the issues are raised and in which the plaintiffs seek a declaratory and limited injunctive remedy. We must emphasize that the record nowhere demonstrates bad faith or deliberate disregard by HUD of the environmental review procedures mandated by NEPA and by the implementing administrative regulations.
 
 
 20
 The issues raised by the plaintiffs' appeal relate to certain alleged deficiencies in HUD's conduct of the preconstruction environmental clearance that was required solely because of federal assistance in financing of the construction of the project. They are raised in the factual context of a completed apartment building in a properly-zoned multi-family area causing alleged injuries in fact (see below) that would equally well have resulted had the building been constructed by a private developer without federal participation in its construction financing. In this post-completion attack upon allegedly defective environmental clearance procedures, the plaintiff associations of neighboring property owners-who did not seek to enjoin or prevent the construction of the building-now ask for declaratory relief holding that the NEPA environmental-review procedures conducted by HUD were deficient in certain respects. The coercive remedies presently sought as a consequence of these declaratory findings are (a) the setting aside of HUD's approval of federal subsidization for the construction, and (b) the enjoining of HUD from paying the developer further rent subsidy or housing assistance payments until (alleged) NEPA preconstruction procedural deficiencies are cured.
 
 
 21
 Aside from some patently meritless contentions, the plaintiffs principally urge that HUD's approval of the project is tainted because the environmental clearance (SEC) on which it was based (1) did not consider alternatives, such as restricting occupancy to childless families, to a plan for tenant occupancy that would overcrowd the neighborhood schools and produce the other ills of which the property-owner associations complain, and (2) did not give due regard to the railroad-noise problem at the subject site. We should here note that these contentions are made in the light of the following alleged injuries in fact complained of by the plaintiffs-as summarized in their brief: "HUD's illegal conduct will result in a diminution in the real estate values of the member's homes, additional strains on the already overburdened schools and social services, increased traffic congestion, increased population density, increased noise pollution, and a general adverse effect on the quality of the homeowners' lives."[3]
 
 
 22
 III. Viability of this Suit in Light of the Completion and Occupancy of the Apartment Complex
 
 
 23
 At oral argument, the developer suggested to the court that, because the project in question has been completed and the apartment units have been fully occupied, the plaintiffs' action is now moot. The mootness issue implicates our jurisdiction to determine the merits of the appeal. See, e.g., St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 537, 98 S.Ct. 2923, 2927, 57 L.Ed.2d 932 (1978). We therefore consider it.
 
 
 24
 Preliminarily, we observe that the basic thrust of the NEPA legislation is to provide assistance for evaluating proposals for prospective federal action in the light of their future effect upon environmental factors, not to serve as a basis for after-the-fact critical evaluation subsequent to substantial completion of the construction. Aertsen v. Landrieu, 637 F.2d 12, 19 (1st Cir. 1980). NEPA imposes upon federal agencies procedural duties that are designed to insure fully-informed and well-considered decisions, the merits of which judicial review is not concerned. Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980). When a federal agency is found to have reached a decision on a proposed construction project without complying with NEPA-mandated procedures, the normal remedy afforded by the courts, where appropriate, is an injunction prohibiting construction and maintaining the status quo until the agency has complied with the statutorily-required procedures. Rodgers, Handbook on Environmental Law 798-809 (1977). See, e.g., Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79, 95 (2d Cir. 1975).
 
 
 25
 Because NEPA contemplates a future-looking agency inquiry, the courts have been reluctant, at least in the absence of blatant bad-faith violations, to grant relief after the challenged project has been substantially or wholly completed, even in instances where the agency, in reaching the decision to build or finance the project in question, has acted in violation of NEPA-mandated preconstruction procedures. Depending upon the specific factual circumstances of each particular case, the courts have employed different rationales in reaching the conclusion that NEPA does not contemplate post-completion relief. For example, in some cases, courts find that they "can not undo what has already been done," and they therefore declare the action moot.[4] In other cases, where the plaintiffs have not filed suit or sought injunctive relief until construction of the challenged project has proceeded to an advanced stage, courts have applied the equitable doctrine of laches to bar the plaintiffs' suit.[5] In yet other instances, the courts simply deem the plaintiffs not to be entitled to any relief, based on the conclusion that countervailing considerations of public interest outweigh any possible benefits that might be obtained by halting or undoing the project.[6]
 
 
 26
 When injunctive relief is an appropriate remedy for purposes of fulfilling the objectives of NEPA, its issuance is limited by general equity principles, and the court should make a particularized analysis of the violations that have occurred, of the possibilities for relief, and of any countervailing societal interests that might be adversely affected by the issuance of an injunction. Environmental Defense Fund v. Marsh, 651 F.2d 983, 1005-06 (5th Cir. 1981); Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Com'n, 606 F.2d 1261, 1272-73 (D.C.Cir.1979). But if the violations of NEPA have been blatant, and if the public interest will not be irreparably harmed, an injunction may be ordered even if the project has proceeded to an advanced stage of completion. See, e.g., Marsh, supra (injunction ordered even though project 55% completed). Although on the same principles post-completion injunctive relief might perhaps theoretically be possible in extreme cases, we have not found a single case in which such relief was granted.
 
 
 27
 In view of these principles, the mere completion of the project might not, technically, moot a claim for injunctive relief based on NEPA violations. Nevertheless, in the light of these principles-because the plaintiffs failed to seek a preliminary injunction to enjoin construction, and because the apartment complex is now complete and fully occupied-the plaintiffs may prevail only if 1) they can demonstrate blatant NEPA violations by the defendant HUD, and if 2) they can show that the value of the requested relief outweighs the public interests that would be adversely affected if relief is granted. Marsh, supra.
 
 
 28
 A. Mootness: Setting Aside HUD Construction Financing Commitments
 
 
 29
 In the present case, the plaintiffs contend that the "tainted approval of federal subsidization for the Project must be set aside." However, they do not specify how this could be accomplished. In view of the fact that the complex has been built and the construction company has been paid, we see no way that HUD's already-satisfied construction financing commitments can now be "set aside." HUD has enabled the developer to obtain permanent financing through another governmental agency (GNMA) of the nearly eight million dollars of construction costs. In accordance with the terms of the mortgage, the developer must now repay these sums to this nondefendant agency (GNMA) over a forty-year period. All that remains for GNMA to do is to collect the mortgage loan payments from the developer. Thus, at least with respect to this aspect of the plaintiffs' claim for relief, the claim is now moot.
 
 
 30
 B. Mootness: Enjoining Further Rent-Subsidy Payments
 
 
 31
 The plaintiffs additionally desire injunctive relief prohibiting HUD from making further rent subsidy payments to the developer for the 44 low-income families residing in the complex, at least until alleged NEPA deficiencies are cured. This court could at least theoretically grant such relief, if deemed appropriate, so to this extent the plaintiffs' claim for relief is not moot, and the case remains a "live" controversy.
 
 
 32
 IV. Enjoining Further Rent-Subsidy Payments: Equitableness of the Remedy
 
 
 33
 However, the chief effect of an injunction prohibiting further subsidy payments would be the eviction of the 44 low-income families from the apartment complex, since they would not be able to afford to pay the full fair-market value rent. The injury to the public interest that would be caused by the uprooting of these 44 innocent families, and the lack of environmental relief that would result from their eviction (their apartments would simply be filled by unsubsidized tenants), are factors that weigh heavily against the plaintiffs in the judicial consideration of their demand for relief of this nature. Cf. Sworob v. Harris, 451 F.Supp. 96, 102 (E.D.Pa.), aff'd. mem., 578 F.2d 1376 (3d Cir. 1978), cert. denied, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979) (irreparable injury that would be suffered by those in desperate need of decent housing is an important factor in determining whether plaintiffs are entitled to equitable relief).
 
 
 34
 As noted previously, in view of the completion and occupancy of the apartment complex in question, the plaintiffs may secure equitable injunctive relief in this case only if they can prove 1) that HUD has blatantly violated NEPA requirements and 2) that the value of the requested relief outweighs adversely affected public interests. Because the plaintiffs have failed to raise genuine factual issues with respect to either of these necessary elements of their case, we agree with the district court that HUD is entitled to summary judgment.
 
 
 35
 A. Claims of NEPA Pre-Construction Procedural Deficiencies
 
 
 36
 Most of the plaintiffs' NEPA claims are wholly without merit. For example, the plaintiffs assert that HUD's decision to fund the project must be "set aside" because HUD failed to comply with timing requirements. Before signing the contracts with the developer, HUD only prepared an NEC, even though, due to the magnitude of the project, HUD regulations required preparation of a more-detailed SEC prior to finalization of the arrangements with the developer. HUD eventually did prepare a SEC, but, because the SEC was not timely prepared, the plaintiffs insist that HUD's decision must be "set aside" in its entirety. However, the rule is that deficiencies in the environmental review process may be required to be corrected, but they do not void the initial agency decision. Initial noncompliance does not preclude eventual compliance. Sierra Club v. Lynn, 502 F.2d 43, 60 (5th Cir. 1974), cert. denied, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975); Upper Pecos Ass'n v. Stans, 500 F.2d 17, 19 (10th Cir. 1974).
 
 
 37
 The plaintiffs' next argument is that HUD's funding decision must be "set aside" because HUD failed to give sufficient public notice or hold a public hearing before reaching its decision. However, although NEPA and its implementing regulations do indeed encourage agencies to obtain public input regarding agency decisions, agencies are under no obligation to hold public hearings or give any particular form of public notice. See Como-Falcon Community Coalition v. United States, Dept of Labor, 609 F.2d 342, 345 (8th Cir. 1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); Scenic Rivers Ass'n. v. Lynn, 520 F.2d 240, 246-47 (10th Cir. 1975), rev'd on other grounds, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1286 (9th Cir. 1973); 40 C.F.R. § 1506.6 (1981). See also Note, 6 Colum.J.Environ.L. 165, 170-73, 180 (1980). In the present case, despite the plaintiffs' vigorous assertions that HUD acted in a covert manner, HUD fulfilled its notice obligations by obtaining input from numerous Dallas public officials, and by obtaining approval from the area "clearinghouse," the North Texas Council of Governments. See 40 C.F.R. § 1506.6(b)(3)(i) (1981).[7]
 
 
 38
 The plaintiffs raise a number of allegations of HUD bad faith and inadequate consideration of environmental factors. However, we have carefully reviewed the record and have found not a scintilla of evidence to support the allegations of bad faith. With respect to each of the so-called "environmental factors" allegedly not considered by HUD,[8] in every instance HUD representatives spoke with the appropriate officials and thereafter reached a reasonable decision that these factors did not require disapproval of the revised proposal. A further indication of HUD's good faith is the rejection, due to environmental factors, of the developer's initial proposal. Thus, "there is no doubt that HUD considered the environmental consequences of its decision .... NEPA requires no more." Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 228, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980).
 
 
 39
 However, although the bulk of the plaintiffs' claims are insubstantial, there are two claims that have at least arguable merit. First, the plaintiffs note that HUD utterly failed to consider any alternatives to the proposed action, as required by section 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E). The § 102(2)(E) obligation to consider alternatives is not limited to proposed major actions significantly affecting the human environment, i.e., actions for which preparation of an EIS is required. See Aertsen v. Landrieu, 637 F.2d 12, 20 (1st Cir. 1980). The provision requires federal agencies to study, develop, and describe alternatives to any proposal "which involves unresolved conflicts concerning alternative uses of available resources." Arguably, HUD should have at least discussed "the conflict as to whether the site should be left as it was or used for low-cost housing." Aertsen, supra, 637 F.2d at 21. On the other hand, here where the real alternatives were either to build or not to build the complex that in part included housing for low-income persons, the failure to address specifically these as alternatives might arguably be viewed as a merely-technical omission to state specifically an alternative implicitly rejected.
 
 
 40
 The only other arguably meritorious contention raised by the plaintiffs concerns the railroad noise problems at the apartment complex site. While the SEC reasonably concludes that the apartments themselves have "acceptable" noise exposures, as defined in 24 C.F.R. § 51.103, the swimming pool area, arguably an "ancillary noise sensitive open space" subject to the noise-level regulations, see id. § 51.106(c), is much closer to the tracks, in an "unacceptably" noisy area. The plaintiffs argue that the project therefore should not have been approved. The plaintiffs also complain that the method of measuring noise-acceptability did not comply with HUD regulations. While we regard at least the latter complaint as without merit, in any event the plaintiffs have no standing to raise any complaint as to noise levels within the apartment complex, because the noise-level regulations are designed solely for the protection of residents of the complex. See Clinton Community Hospital Corp. v. Southern Maryland Medical Center, 510 F.2d 1037, 1038 (4th Cir.), cert. denied, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975) (plaintiffs lacked standing to bring a NEPA action based on the allegation that a proposed hospital should not be constructed near a noisy airport, because the plaintiffs would not suffer from such noise).
 
 
 41
 B. Equitable Remedy Appropriate?
 
 
 42
 In summary, the record demonstrates that, in apparent good faith, HUD attempted to comply with NEPA requirements and that it in fact did so with two exceptions that, in the context of the issues raised, are minor. Considering the good-faith and relatively minor deficiencies in HUD's preconstruction environmental clearance study, as well as the circumstance that, unopposed by the plaintiffs, the construction and occupancy of the apartment complex are now complete, we do not think that the nonmoot post-completion equitable remedy sought-the enjoining of rent-subsidy payments to the low-income tenants until the deficiencies are cured-should appropriately be granted. On the one hand, it is doubtful that the remedy sought would actually afford relief to the plaintiffs as to the environmental harms of which they complain-the schools and traffic would be as much or as little congested by the unsubsidized tenants who would replace the low-income families formerly aided by the rent-subsidy payments. On the other hand, the great harm that would be sustained by the displaced low-income tenants weighs heavily against granting the plaintiffs the "equitable" remedy they seek. See Sworob v. Harris, supra, 451 F.Supp. at 102. Moreover, in our view it is extremely unlikely that any HUD (re)approval of the apartment project would be conditioned upon the developer accepting any of the alternative tenant-occupancy plans suggested by the plaintiffs.
 
 
 43
 In similarly denying post-completion relief grounded on preconstruction environmental-study inadequacies belatedly raised, the First Circuit noted the social waste, without contribution to the legislative environmental purposes, of ordering the "undoing and redoing (of) what has been done" in the light of "(r)etrospective review (that), with the benefit of hindsight, would predictably reveal in many projects some lapse of planning and foresight...." Ogunquit Village Corp. v. Davis, 553 F.2d 243, 245 (1st Cir. 1977). For these reasons, as well as those previously set forth to the effect that an injunctive remedy would be inappropriate under present circumstances, we find no error in the judgment of the district court denying the plaintiffs' demand for post-completion relief grounded on inadequacies in the preconstruction environmental clearance study.
 
 Conclusion
 
 44
 The plaintiffs, associations of residential property owners in the neighborhood, seek to have HUD's approval of an already-completed apartment complex set aside, and to enjoin rent-subsidy payments to low-income tenants, because of inadequacies in the preconstruction environmental clearance. In the context of the issues raised, the demand to set aside the preconstruction HUD approval is moot, and the demand for post-completion relief enjoining payment of rent subsidies is inappropriate under the circumstances. We therefore AFFIRM the judgment of the district court.
 
 
 45
 AFFIRMED.
 
 
 
 [1]
 The defendants shall be collectively referred to as "HUD." The plaintiffs sued the Secretary of HUD. Walnut Place, Ltd., the developer of the apartment complex in question, subsequently intervened as a defendant
 
 
 [2]
 Although it is not clear from the record, it seems that sometime subsequent to December 1980, the developer changed its name from Landmark Properties, Inc., to Walnut Place, Ltd
 
 
 [3]
 A strong argument could be made that the plaintiffs do not have standing to raise their NEPA claims because none of the environmental injuries alleged by the plaintiffs would be remedied by granting the proposed relief-assuming for present purposes that they have met other standing requirements (a) that they suffered injury in fact through the putatively illegal conduct of HUD and (b) that their interests are at least arguably within the zone of interests protected or regulated by the statutory framework within which their claim arises. Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 37-39, 96 S.Ct. 1917, 1924-25, 48 L.Ed.2d 450 (1976). Without close examination, and in the procedural context of a summary judgment showing that requires us to make all factual inferences in their favor, we will assume without deciding that the plaintiffs have standing because at least theoretically the judicial enjoining of further rent subsidies (if they have been improperly granted by HUD), see text at III B infra, would alleviate the alleged deleterious impact on the "human environment" caused by the number of the tenants in the federally-assisted apartment project. See 24 C.F.R. § 50.3 (1981), interpreting "environment" broadly so as to include social dimensions of the human environment, such as "urban congestion, overcrowding," ... "social services and amenities," etc. But see Como-Falcon Community Coalition v. United States Dept. of Labor, 609 F.2d 342, 345-46 (8th Cir. 1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); Maryland-National Capital Park & Planning Comm'n v. United States Postal Service, 487 F.2d 1029, 1037 (D.C.Cir.1973); Note, 6 Colum.J.Environ.L. 165, 182-83 (1980); Note, 6 Colum.J.Environ.L. 31, 49-50 (1979). Because the plaintiffs lose either because their claims lack merit or because they lack standing, we stress that the assumption of standing, arguendo, does not imply its recognition
 
 
 [4]
 See, e.g., Florida Wildlife Federation v. Goldschmidt, 611 F.2d 547, 549 (5th Cir. 1980); Friends of the Earth, Inc. v. Bergland, 576 F.2d 1377, 1379 (9th Cir. 1978)
 
 
 [5]
 See, e.g., Save Our Wetlands, Inc. (SOWL) v. United States Army Corps of Engineers, 549 F.2d 1021, 1026-29 (5th Cir.), cert. denied, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); Sworob v. Harris, 451 F.Supp. 96, 101-02 (D.C.Pa.), aff'd mem., 578 F.2d 1376 (3d Cir. 1978), cert. denied, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979)
 
 
 [6]
 See, e.g., Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n., 606 F.2d 1261, 1272-73 (D.C.Cir.1979); Ogunquit Village Corp. v. Davis, 553 F.2d 243, 245-47 (1st Cir. 1977)
 
 
 [7]
 Aside from their NEPA claims, the plaintiffs allege that HUD's action caused such a decrease in the value of their members' homes as to amount to a taking of property without due process of law. Regardless of whether the plaintiffs have standing to raise this constitutional claim, the claim is without merit. Notwithstanding an effect upon property values by government action, there is no taking within the purview of the due process clause without some diminution of the owner's rights of use in his property, i.e., actual interference or encroachment of some degree. Florida East Coast Properties, Inc. v. Metropolitan Dade County, 572 F.2d 1108, 1111 (5th Cir.), cert. denied, 439 U.S. 894, 99 S.Ct. 253, 58 L.Ed.2d 240 (1978); Society Hill Civic Ass'n. v. Harris, 632 F.2d 1045, 1059 (3d Cir. 1980); Sayre v. City of Cleveland, 493 F.2d 64, 69-70 (6th Cir.), cert. denied, 419 U.S. 837, 95 S.Ct. 65, 42 L.Ed.2d 64 (1974)
 
 
 [8]
 These factors allegedly not considered by HUD include: overcrowding of schools, flooding problems, noise problems, and inaccessibility of public transportation