MANASOTA–88, INC., Petitioner,

v.

Lee M. THOMAS, Administrator, Environmental Protection Agency, and the United States Environmental Protection Agency, Respondents,

and

Gardinier, Inc., Intervenor-Respondent.

No. 85–3837.

United States Court of Appeals,
Eleventh Circuit.

Sept. 15, 1986.

Thomas W. Reese, St. Petersburg, Fla., for petitioner.

David W. Zugschwerdt, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., Thomas DeRose, U.S. E.P.A., Atlanta, Ga., Joseph Freedman, Office of General Counsel, U.S. E.P.A., Washington, D.C., for respondents.

Robert L. Rhodes, Jr., Holland & Knight, Lakeland, Fla., for intervenor-respondent.

Before JOHNSON and ANDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. As part of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, Congress created the NPDES permit scheme to regulate the discharge of any pollutant to navigable waters. 33 U.S.C. § 1342(a). "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). "Pollutant" is defined broadly to encompass numerous substances, including all industrial, municipal and agricultural wastes. 33 U.S.C. § 1362(6). "Navigable waters" are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "Point source" is defined broadly as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). NPDES permits are issued for a fixed term not to exceed five years. 40 C.F.R. § 122.46.*

The NPDES permitting process is triggered by the submission of an application by "any person

GARZA, Senior Circuit Judge:

## BACKGROUND

Gardinier, Inc. ("Gardinier"), is engaged in mining and processing phosphate ore and manufacturing fertilizers and other chemical products at its Tampa Chemical plant located in Hillsborough County, Florida. On June 30, 1977, the United States Environmental Protection Agency ("EPA" or "Agency") issued Gardinier a five-year National Pollution Discharge Elimination System ("NPDES") permit regulating discharges from this facility.[1]

On May 17, 1979, Gardinier notified the EPA of its plan to make process modifications and to expand plant capacity by 20 per cent. Gardinier also noted that continued operations would require the future development of a disposal area for "phosphogypsum," a waste product of the phosphate process. Gardinier proposed that environmental review of the disposal area be conducted simultaneously with that for the plant process modifications and capacity expansion and, on October 4, requested that the EPA make a formal initial determination as to whether its proposed process modifications constituted a "new source."[2] EPA issued its initial determination that

who discharges or proposes to discharge pollutants and who does not have an effective permit...." 40 C.F.R. § 122.21(a). NPDES permits contain terms and conditions to implement various requirements of the CWA. The principal form of control is the imposition of effluent limitations on the type and amount of effluent that can be discharged. An "effluent limitation" is a restriction on the quantity, rate, and concentration of chemical, physical, biological and other constituents discharged from point sources. 33 U.S.C. § 1362(11).

* Unless otherwise indicated, we shall refer to the current regulations.

2. In pertinent part 40 C.F.R. § 122.2 provides that:

*New source* means any building structure, facility, or installation from which there is or may be a "discharge of pollutants," the construction of which commenced:

(a) After promulgation of standards of performance under section 306 of CWA which are applicable to such source....

the plant modifications constituted a new source for NPDES permitting purposes on November 1, 1979.[3]

On October 30, 1980, the EPA issued an environmental assessment ("EA") and a "finding of no significant impact" ("FON-SI") concerning both Gardinier's plant modifications and proposed phosphogypsum disposal area.[4] The Agency concluded that no significant impact on environmental

quality was present.[5] The EPA also issued public notice initiating a thirty-day public comment period on its initial new source determination, its environmental review and its draft proposed modified NPDES permit. The notice contained information on procedures for making both public hearing requests to supplement written comments, and for requesting an evidentiary hearing subsequent to the Agency's final

*See also,* 33 U.S.C. § 1316(a). New industrial point sources, such as that involved in this case, are subject to special rules under the CWA. Pursuant to 33 U.S.C. § 1316, new sources must meet technology-based effluent limitations, or "standards of performance," for the control of pollutant discharges reflecting the greatest degree of effluent reduction that can be achieved through application of the best available demonstrated control technology, including, where practicable, a "no discharge" standard. *See* 33 U.S.C. § 1316(a)(1).

3. Where the facility for which an NPDES permit is sought "may be a new source," special information requirements are imposed to enable the EPA Regional Administrator to "determine if the facility is a new source." 40 C.F.R. § 122.-21(k)(2)(i). Once these special information requirements have been satisfied, the Regional Administrator is required to make "an initial determination whether the facility is a new source within 30 days," 40 C.F.R. § 122.-21(k)(ii), by applying the criteria set forth in 40 C.F.R. § 122.29(b). The Regional Administrator's initial new source determination, whether affirmative or negative, is subject to public notice and may be challenged "within 30 days of issuance of the public notice of the initial new source determination" by the submission of an evidentiary hearing request from "[a]ny interested person." 40 C.F.R. § 122.21(k)(4).

4. It is clear that the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.,* is applicable to the initial issuance of an NPDES permit to a new source. *See* 33 U.S.C. § 1371(c)(1). Thus, where the Regional Administrator initially determines that a facility is a new source for NPDES permitting purposes, the requirement for environmental review is triggered. C.F.R. §§ 6.604(a), 122.29(c)(1), and 122.21(k)(3). The Agency's environmental review proceeds concurrently with the processing and review of the new source NPDES permit application. 40 C.F.R. § 6.603. The review is based upon an environmental information document prepared by the permit applicant, from which a written "environmental assessment" is prepared. 40 C.F.R. § 6.604(b) and (c).

NEPA requires the EPA to determine whether issuance of an initial NPDES permit constitutes

a "major Federal action significantly affecting the quality of the human environment," and thus whether an "environmental impact statement" must be prepared to assess fully the overall environmental impact of the facility's operations. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 6.604. The EIS evaluates the significance of the project's environmental impact by utilizing the specific criteria set out at 40 C.F.R. § 6.605(b). "When the environmental review indicates no significant impacts are anticipated or when the proposed project is changed to eliminate the significant adverse impacts, a [FONSI] shall be issued which lists any mitigation measures necessary to make the recommended alternative environmentally acceptable." 40 C.F.R. § 6.604(d)(1). Finally, the FONSI is subject to public review and comment. 40 C.F.R. § 6.400(d).

5. The air quality impacts were assessed as follows:

The uppermost, exposed section of the proposed gypsum disposal field may become an intermittent source of particulates by wind blown fugitive dust. However, the quantity would be small and the particle weight would preclude significant dispersion. Since the gypsum waste contains the bulk of the radium–226 originally present in the phosphate ore, the gypsum stack would also serve as a source of airborne radiation by direct emanation of radon gas produced by the decay of radium–226. However, the amount would be insignificant and any effect would be confined to the immediate area of the field itself.

Environmental Assessment, Rec.Doc. No. 37, at 9.

In pertinent part, the agency's FONSI reads: The surface of the proposed gypsum disposal field will be an intermittent source of particulates by wind blown fugitive dust. The gypsum stack will also be a source of airborne radiation by direct emanation of radon gas. However, in either case *the amounts will be insignificant and any effect would be confined to the immediate area of the field itself with no effect off the company property.*

Finding of No Significant Impact, Rec.Doc. No. 37, at 3. (emphasis added).

determination on issuance of the proposed modified permit.[6]

On November 15, 1980, Manasota–88, Inc. ("Manasota–88"), a non-profit, environmental organization, submitted its written comments, directing the Agency's attention to a technical support document prepared in August, 1979, by EPA's Office of Radiation Programs ("ORP") regarding emissions of "radionuclides" into the atmosphere. On February 24, 1981, EPA issued Gardinier a modified NPDES permit effective March 26, 1981, with an expiration date of August 15, 1982. Manasota–88 did not pursue further review of the Agency's issuance of the modified NPDES permit to Gardinier.

Prior to the expiration of its modified NPDES permit, Gardinier applied for reissuance on February 11, 1982. On March 29, 1984, the EPA issued public notice commencing a thirty-day comment period on reissuance of Gardinier's NPDES permit. Manasota–88 submitted written comments requesting that the Agency prepare an EIS prior to reissuing Gardinier's NPDES permit. Specifically, Manasota–88 asserted that the Agency's 1980 FONSI "was based upon limited and inaccurate information" and cited data from the ORP document to which it had referred in submitting its November 15, 1980, comments on the adequacy of the Agency's environmental review.

On May 9, 1984, Manasota–88 submitted additional comments combined with a request for an informal public hearing.

On September 20, 1984, the Agency held a public hearing in which Manasota–88 presented additional comments with respect to radon emissions from the proposed phosphogypsum disposal area. The EPA agreed with Manasota–88 that the Agency's 1980 FONSI, "although it was adequate at the time of issuance, does not reflect [what] appears to be additional information ... [and that, the Agency would] study the specific issue regarding radioactivity emissions from ... gyp stacks". However, a week later, on September 28, 1984, the EPA reissued Gardinier's NPDES permit effective November 1, 1984, with an expiration date of October 31, 1989. Written notice of this permit determination was issued on October 22, 1984.

Manasota–88 responded to the Agency's notice of its final determination by filing a Request for Evidentiary Hearing on November 19, 1984. Manasota–88 contended that the 1980 FONSI was erroneous and required the Agency to develop a full-scale EIS prior to reissuance of Gardinier's NPDES permit. The Agency's Region IV Administrator concluded that the request failed to raise any material issue of fact,

**6.** The processing and substantive review of the permit application is initiated by the preparation of a draft permit and explanatory fact sheet. 40 C.F.R. §§ 124.6, 124.8 and 124.56. These documents are based upon the administrative record as defined in 40 C.F.R. § 124.9, including environmental review documents. *See* 40 C.F.R. § 124.9(b)(6). Once the draft permit and support documents have been prepared, public notice of this action is given, initiating a 30–day period for receipt of public comment. 40 C.F.R. § 124.10(a)(1)(ii) and (b)(1). During this period, written comments may be submitted by "any interested person", and a request for a discretionary public hearing may be filed. 40 C.F.R. §§ 124.11 and 124.12. After the close of the comment period, the Regional Administrator bases his final permit decision on the administrative record defined at 40 C.F.R. § 124.18. That decision, accompanied by a response to comments received, is then issued. 40 C.F.R. §§ 124.15(a) and 124.17. A notice of this decision, including information as to procedures for challenging the decision, is directed to

"the applicant and each person who has submitted written comments or requested notice of the final permit decision." 40 C.F.R. § 124.-15(a).

Review of the final permit decision is obtained by filing a request for an evidentiary hearing within thirty days after service of the decision. 40 C.F.R. § 124.74(a). The Regional Administrator must act upon the evidentiary hearing request within an additional 30 days. 40 C.F.R. § 124.75(a)(1). Any denial of the request may be appealed to the EPA Administrator; any such appeal to the EPA Administrator must be taken within 30 days, and is a prerequisite to review of the denial as a final agency action. 40 C.F.R. § 124.91(a)(1) and (e). Finally, once EPA has made its final decision as to whether to issue or deny an NPDES permit, "any interested person" may obtain judicial review of that decision by filing an application for such review "in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides...." 33 U.S.C. § 1369(b)(1).

and that the relevant legal objections were not well taken. Accordingly, he denied Manasota–88's evidentiary hearing request on April 18, 1985. The EPA Administrator, on appeal, denied review of the permit reissuance determination on August 2, 1985. Manasota–88 timely filed its petition for review in this court on October 29, 1985.

## STANDARD OF REVIEW

■ Generally speaking, the court's review of an agency's final decision is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* Under this statute, the "reviewing court shall … hold unlawful and set aside agency actions, findings and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This deferential standard presumes the validity of the agency action and prohibits a reviewing court from substituting its judgment for that of the agency. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). "Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute … not simply because the court is unhappy with the result reached." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1979).

■ The courts' proper function in reviewing an agency's action is to determine whether the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). To affirm, a court must only determine that the agency had a rational basis for its decision. "While we may not supply a reasoned basis for the agency's action that the

agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman,* 419 U.S. at 285–86, 95 S.Ct. at 442. In the NEPA context "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas,* 462 U.S. at 97–98, 103 S.Ct. at 2252.

■ Manasota–88 has urged this court to apply a "reasonableness" standard of review to the Agency's decision to reissue Gardinier's NPDES permit. According to Manasota–88, the EPA's decision not to prepare an EIS prior to reissuance requires a higher degree of judicial scrutiny. Although this circuit has not heretofore articulated the standard of review applicable to an agency's decision not to prepare an EIS, the former Fifth Circuit has held that a reasonableness standard is appropriate. *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir.1973).

In *Kreger* the court noted that

[t]he spirit of [NEPA] would die aborning if a facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review. Every such decision pretermits all consideration of that which Congress has directed be considered 'to the fullest extent possible.' The primary decision to give or bypass the consideration required by [NEPA] must be subject to inspection under a more searching standard.

*Id.* at 466. The Fifth Circuit has recently reaffirmed the reasonableness standard of review for an agency decision not to prepare an EIS. *See Fritiofson v. Alexander,* 772 F.2d 1225, 1237 (5th Cir.1985). We, therefore, agree with Manasota–88 that a reasonableness standard is appropriate for

reviewing an agency's decision not to prepare an EIS.[7]

■ We cannot, however, agree with Manasota–88's characterization of the issue in this case as one merely involving the EPA's refusal to prepare an EIS. The EPA found that Gardinier's proposed phosphogypsum disposal area was not a new source within the meaning of 33 U.S.C. § 1316(a)(2). Specifically, the Region IV Administrator found

> that the major modifications proposed by Gardinier have all been completed except for the proposed new gypsum disposal area, which *considered alone,* would not now, nor in 1979, have resulted in a determination that the Gardinier facility was a new source; hence, no environmental assessment would have been mandated by NEPA, if only a new gypsum disposal area had been proposed.

As the Agency points out, the pertinent statutory and regulatory provisions make clear that the obligation to prepare an EIS under NEPA does not apply to the NPDES permitting process *except as to new sources.*

> Except for ... the issuance of a permit under section 1342 of this title for the discharge of any pollutant by a new source as defined in section 1316 of this

title, *no action of the Administrator taken pursuant to this chapter shall be deemed a major federal action significantly affecting the quality of the human environment within the meaning of [NEPA]. ..."*

33 U.S.C. § 1371(c)(1) (emphasis added). 40 C.F.R. § 124.9(b)(6) provides that "NPDES permits, other than permits to new sources ... are not subject to the [EIS] provisions of ... [NEPA]." *Cf., Mahelona v. Hawaiian Electric Co., Inc.,* 418 F.Supp. 1328, 1334 (D.Haw.1976) ("There is no dispute that EPA was required to prepare an EIS only if the discharge facility is a 'new source' "); *See generally, Save the Bay, Inc. v. United States Corps of Engineers,* 610 F.2d 322, 326 (5th Cir.1980); *Simons v. Gorsuch,* 715 F.2d 1248, 1251–52 (7th Cir. 1983); Conference Report 92–1236, 92d Cong.2d Sess., *reprinted in* 1972 U.S. CODE CONG. & ADMIN.NEWS, 3668, 3826. Thus, we find that the Agency's determination that Gardinier's proposed phosphogypsum facility is not a new source, and hence, its decision to reissue Gardinier's modified NPDES permit without preparing a full-scale EIS, though subject to a reasonableness standard, would also necessarily withstand an attack under the arbitrary and capricious standard of review as well.[8]

7. We note that three other circuits have employed a "reasonableness" standard of review. *See Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269, 271 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *Foundation for North American Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1177–78 (9th Cir.1982); *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244, 1248–49 (10th Cir.1973). By contrast, the First, Second, Fourth and Seventh Circuits will reverse an agency's failure to prepare an EIS only if it is arbitrary and capricious. *See Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980); *Hanly v. Kleindienst,* 471 F.2d 823, 828–29 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Webb v. Gorsuch,* 699 F.2d 157, 160 (4th Cir.1983); *Nucleus of Chicago Homeowners Ass'n. v. Lynn,* 524 F.2d 225, 229 (7th Cir.1975) *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). We note, moreover, that three justices of the Supreme Court have argued that the full Court should review a case such as the one at bar to end the "disarray" and "confusion" that exists

on this issue. *Gee v. Boyd,* 471 U.S. 1058, 105 S.Ct. 2123, 85 L.Ed.2d 487 (1985) (White, J., joined by Brennan, J. & Marshall, J., dissenting from denial of petition for certiorari).

Under the ruling of *Bonner v. City of Prichard, Alabama,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court is required to follow those decisions of the former Fifth Circuit rendered prior to October 1, 1981. We, as a three-judge panel of the court, are not empowered to overrule panel or en banc decisions of either this circuit or the former Fifth Circuit. *Id.* at 1209. We are, therefore, constrained to follow the ruling in *Kreger* with respect to the standard of review of an agency decision refusing to prepare an EIS.

8. As a practical matter, we note that the differences between the "reasonableness" and "arbitrary and capricious" standards of review are often difficult to discern *Cf. River Road Alliance, Inc. v. Corps of Engineers of United States Army,* 764 F.2d 445, 449 (7th Cir.1985) *cert. denied* — U.S. —, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986) ("we are not sure how much, if any

## DISCUSSION

### I.

■ Manasota–88 contends that the EPA's determination that Gardinier's proposed phosphogypsum disposal area is not a new source is arbitrary and capricious. Manasota–88 argues that the proposed disposal area constitutes construction activity resulting in a new source within the meaning of the regulations. 40 C.F.R. § 122.-29(b)(1) provides:

Except as otherwise provided in an applicable new source performance standard, a source is a "new source" if it meets the definition of "new source" in § 122.2, and

(i) It is constructed at a site at which no other source is located; or

(ii) It totally replaces the process or production equipment that causes the discharge of pollutants at an existing source; or

(iii) Its processes are substantially independent of an existing source at the same site. In determining whether these processes are substantially independent, the Director shall consider such factors

as the extent to which the new facility is integrated with the existing plant; and the extent to which the new facility is engaged in the same general type of activity as the existing source.[9]

Manasota–88 claims that Gardinier's proposed disposal area will replace the existing disposal area in seven years.

Manasota–88's argument is flawed for several reasons. First, as the EPA and Gardinier note, Gardinier's proposed disposal area and its original proposal for plant capacity expansion were both the subject of EPA's environmental review in 1980. It follows that the proposed disposal area cannot logically be viewed apart from Gardinier's plant and entire modification scheme of 1979, since the field will handle phosphogypsum waste from both the original and expanded plant facilities. Second, as is obvious from the record before us, Gardinier has undertaken and completed construction of its expanded plant facilities in reliance on the EPA's approval in 1981 of the proposed disposal area.[10]

Finally, Gardinier's plans with respect to the proposed disposal area have not changed since the EPA issued Gardinier's

practical difference there is between 'abuse of discretion' and 'unreasonable'"); *Lower Alloways Creed Tp. v. Public Service Electric & Gas Co.*, 687 F.2d 732, 742 n. 23 (3rd Cir.1982) ("In some instances the distinction between the two standards tends to blur").

As the court in *River Road* noted:
Courts dissatisfied with the "abuse of discretion" formulation are concerned that an agency whose primary mission is not the protection of the environment—an agency such as the Corps of Engineers—may tend to slight environmental concerns in deciding whether to encumber its decision-making process with an environmental impact statement.
764 F.2d at 449. Unlike other federal agencies, the EPA is charged with the protection of the environment. Thus, the need for a different standard of review in the present context becomes even less pronounced.

9. The regulations in effect at the time of the reissuance proceedings provided that:
The following construction activities result in a new source:
(i) Construction of a source on a site where another source is not located, or
(ii) Construction on a site at which another source is located of a building, structure,

facility, or installation from which there is or may be a discharge of pollutants if:
(A) the process or production equipment that causes the discharge of pollutants from the existing source is totally replaced by this construction, or
(B) the construction results in a change in the nature or quantity of pollutants discharge.
40 C.F.R. § 122.29(b)(1) (1984).

10. We note that Manasota–88 did not pursue its administrative remedies following issuance of the modified NPDES permit in 1981. Because Gardinier proceeded with construction of its expanded plant facilities based on the EPA's approval of its entire plant modification scheme, the doctrine of laches could preclude the requirement that an EIS be prepared, even if NEPA were applicable. *See Save Our Wetlands, Inc. v. United States Army Corps of Engineers,* 549 F.2d 1021 (5th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *See also, Richland Park Homeowner's Ass'n., Inc. v. Pierce,* 671 F.2d 935, 941–42 (5th Cir.1982). Our resolution of this case on the basis of the Agency's determination that Gardinier's proposed disposal field is not a new source renders a discussion of laches unnecessary.

modified NPDES permit in 1981. It is apparent that modifications to the proposed disposal facility would support Manasota–88's contention that the area should be viewed as a new source. However, the same proposed disposal facility before the EPA during the Agency's environmental review in 1980 and issuance of the modified NPDES permit in 1981 continued to be before the EPA during reissuance of the permit in 1984, and continues to be before this court at the present time. Based on the foregoing, we cannot say that the EPA's determination that the proposed phosphogypsum disposal area is not a new source was arbitrary or capricious, and therefore, that the Agency's decision not to prepare an EIS was unreasonable. *Cf., Burbank Anti-Noise Group v. Goldschmidt,* 623 F.2d 115, 116 (9th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981) ("An EIS is not required, however, when the proposed federal action will effect no change in the status quo"); *Committee for Auto Responsibility v. Soloman,* 603 F.2d 992, 1002–03 (D.C. Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980) (same).

## II.

■ Manasota–88 also argues that the EPA has a continuing obligation to implement NEPA as to Gardinier's proposed phosphogypsum disposal facility and to prepare an EIS because "new facts" have undermined the adequacy of the EPA's 1980 environmental review, in general, and the FONSI, in particular. Specifically, Manasota–88 draws this court's attention to: (1) the EPA's 1979 ORP report on radionuclide emissions; (2) a statement of the EPA's Region IV Water Management Division Director during the September 20, 1984, hearing that the Agency's 1980 FONSI did not reflect "additional information"; (3) the EPA's October 31, 1984, Federal Register notice stating the lifetime risks to health from exposure to air emissions from phosphogypsum sites, including the risk of one fatal cancer per year; and (4) the close proximity (less than 600 feet) of the proposed disposal area to the home of Mr. Dan Lyons.

We note that Manasota–88 did not challenge the adequacy of the Agency's environmental review, the scope of the initial new source determination, or the decision to issue Gardinier a modified NPDES permit. Although Manasota–88 has properly challenged the EPA's decision to reissue the permit, it is barred from attacking the Agency's determinations which formed the basis of its decision to issue Gardinier a modified permit or the permit decision itself. It follows that the decision to reissue Gardinier's permit may not be challenged to the extent it is based on the *same* EPA environmental determinations.

We do acknowledge, however, that the discovery of new facts or information bearing on the EPA's decision to issue a NPDES permit could require the Agency to reassess its prior determinations before reissuing the permit. *Cf.* 40 C.F.R. § 1502 (i)(1) (requiring agencies to prepare a supplemental EIS if there are substantial changes in the proposed action relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts). Our review of the record discloses no new facts sufficient to require the EPA to reassess its prior determinations, to find that Gardinier's proposed disposal facility is a new source for NPDES permitting purposes, or to prepare an EIS before reissuing Gardinier's permit.

## CONCLUSION

Because we see no grounds on which to disturb the action of the EPA in reissuing Gardinier's NPDES permit, we dismiss Manasota-88's petition for review.

PETITION DISMISSED.