Rick WEBB, Petitioner,

v.

Anne GORSUCH, Administrator, Environmental Protection Agency, Brooks Run Coal Company, Lackey Coals, Inc., T. & R. Coal Company, Lexie Coal Corporation, D. & K. Coal Company, Inc., and Pammlid Coal Company, Inc., Respondents.

No. 82–1586.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 11, 1982.

Decided Jan. 20, 1983.

John McFerrin, Barbourville, Ky., Appalachian Research and Defense Fund, Inc. for petitioner.

Gregory R. Gorrell, Charleston, W. Va. (W. Henry Jernigan, Mark C. Russell, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., on brief) and Joseph Freedman, U.S. Environmental Protection Agency, Steubenville, Ohio (Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Jose Allen, David T. Buente, Jr., Dept. of Justice, Washington, D.C., Robert M. Perry, Houston, Tex., Associate Administrator and Gen. Counsel, Bruce Diamond, Acting Associate Gen. Counsel, U.S. Environmental Protection Agency, Washington, D.C., William Early, U.S. Environmental Protection Agency, Philadelphia, Pa., on brief), for respondents.

Before WINTER, Chief Judge, CHAPMAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

By his petition for review authorized by § 509(b)(1)(F) of the Federal Water Pollution Control Act, sometimes called the Clean Water Act (CWA), 33 U.S.C. § 1369, Rick Webb challenges the validity of five permits granted by the Environmental Protection Agency (EPA). The permits were issued under CWA to allow Brooks Run

Coal Co. and others (the companies),[1] all of which propose to operate underground coal mines, to discharge water from their mines. Webb contends that EPA acted arbitrarily and capriciously (1) in determining that the discharge of water from the mines was not likely to have a significant environmental impact, (2) in declining to include biological monitoring conditions in the companies' discharge permits, and (3) in including certain technical data not in the record in its response to Webb's comments on the draft permits. Webb also contends that EPA abused its discretion in not holding an informal public hearing prior to issuance of the discharge permits.

We see no merit in any of these contentions and so we dismiss the petition for review.

### I.

Rick Webb is a resident of central West Virginia and owns land near a mining complex under development by the companies. In January 1980 Brooks Run filed a National Pollution Discharge Elimination System (NPDES) permit application to open mines 3A and 4A in that complex; in July of that year it filed applications for mines 3B and 5B; and in September it filed an application for 8A. The mines are expected to be in operation for a period of twenty years. After its own investigation and the submission of data from Brooks Run and its consultants, the Regional Office of EPA issued public notices in February and March 1981 containing proposed permits, a statement of its basis for granting the permits, and a tentative conclusion that the mines would have no significant environmental impact. In the ensuing public comment period Webb submitted lengthy written comments. After reviewing the technical data it had assembled, the permit application and Webb's comments, the Regional Office of EPA decided to issue the permits for a five-year term. Webb then requested a public hearing before the Regional Office, which was denied. Webb attempted to appeal the Regional Office's decision to respondent Gorsuch, but the appeal and a requested stay were both denied.

Webb originally sought judicial review of the permits in the United States District Court for the Southern District of West Virginia. The district court ruled that judicial review could be had only by direct petition for review in the Court of Appeals. Webb then brought this suit and sought a stay of the effectiveness of the permits pending review. We denied his application for a stay pending review.

### II.

We consider first the contention that the permits are invalid because EPA acted arbitrarily and capriciously in determining that the discharge of water from the mines was not likely to have a significant environmental impact. The importance of the contention rests on the fact that EPA did not prepare an Environmental Impact Statement (EIS) before issuing the permits, as is ordinarily required. By virtue of CWA, 33 U.S.C.A. § 1371(c), and the National Environmental Policy Act (NEPA), 42 U.S.C.A. § 4332, EPA must prepare an EIS before granting a permit for the discharge of any pollutant by a new source unless it determines that that discharge will have no significant environmental impact. *See* 40 C.F.R. Part 6. EPA's determination that a contemplated action will have no significant environmental impact, and so does not require an EIS, will be sustained unless it is arbitrary and capricious. *Providence Road Community Ass'n v. EPA,* 683 F.2d 80 (4 Cir.1982); *Citizens Against the Refinery's Effects (CARE) v. EPA,* 643 F.2d 178, 181–83 (4 Cir.1981).[2]

---

1. Lackey Coal Co., Lexie Coal Co., Pammlid Coal Co., T. & R. Coal Co. and D. & K. Coal Co.

2. A threshold issue here is whether, in determining if EPA acted arbitrarily or capriciously, we may consider several affidavits and reports from the West Virginia Department of Natural Resources offered by Webb which were not placed before the Agency in determining whether the Agency's action was arbitrary. We conclude we may, for courts generally have been willing to look outside the record when assessing the adequacy of an EIS or a determination that no EIS is necessary. *See County of*

The parties do not seriously contest that if there is significant acid drainage from the mines, it would have a significant environmental impact. The affected streams and river contain several species of fish that would be harmed by acid drainage, an affected stream has been designated as high quality by the state, and the river is being considered for inclusion in the National Wild and Scenic River System. The issue is whether such drainage will occur. The Agency concluded it will not because only insignificant amounts of water will enter the mines, that water has an alkaline or acid-neutralizing property, the strata in and about the mines are non-acidic, the mines are down-dip or downward sloping which will prevent water from draining out and the monitoring and treatment required by the permits and as conditions for their renewal will prevent unforeseen acid drainage from causing harm.

There is evidence in the record that not all of these factors will operate to prevent acid drainage from three of the mines for which permits have been granted: mines 3B, 5B, and 8A. Mines 3B and 5B are updip, or substantially upward sloping, so water which accumulates in those mines will drain out. The scientific study relied upon by EPA, prepared by Earth Science Consultants, Inc., an independent consultant employed by Brooks Run, and a letter submitted to EPA by the Office of Surface Mining (OSM) indicated that acid-producing strata exist in mines 3B, 5B and 8A. Nor is it clear that the groundwater is sufficiently alkaline to offset the acid-producing potential of the coal and the shale in these mines. OSM concluded that it would not be, and its views are buttressed by reports from the West Virginia Department of Natural Resources that the drainage from mine 8A has been highly iron laden and hence acidic.

But the record also contains evidence that only a slight quantity of groundwater will enter the mines and that any water discharged can be treated to eliminate harmful acid drainage. Both Earth Science Consult-

ants and D'Appolonia, Inc., Brooks Run's consultants, concluded that acid drainage could be prevented while the mines were active by the use of treatment pools and other methods. Webb does not question those findings, but instead argues that no evidence was before EPA indicating acid drainage could be abated once the mines were closed. Given the importance placed on treatment as a factor mitigating possible acid drainage at mines 3B, 5B and 8A by Brooks Run's consultants, it is perhaps unfortunate that EPA failed to document possible techniques for controlling postmining acid drainage.

 But even in the absence of such data, we cannot conclude that EPA's finding of no significant environmental impact was arbitrary. Two reasons require this conclusion. First, there is in the record substantial evidence that because of the absence of any nearby water-bearing rock formations and the impermeable nature of the surrounding sandstone, no significant amounts of water will enter the mines. Of course Webb and his affiants contend that EPA, and the studies upon which it relies, failed to consider the highly variable nature of the geological structures depended upon to limit fracturing and seepage. However, this contention is met by evidence that Earth Science found the sandstone structures were continuous throughout the area, and several test wells were sunk, of which only one produced significant water. Thus we are unable to conclude that EPA's finding of the impermeable nature of the surrounding sandstone was arbitrary. When there is conflicting expert opinion, it is for the administrative agency and not the courts to resolve the conflict. See, e.g., *Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1028 (4 Cir.1975). While there is not insignificant evidence that, by seepage and drainage through the portals, there would inevitably be minor water drainage into the mines, the record does not compel the conclusion that such minimal inflow would be uncontrollable, or

---

*Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1384 (2 Cir.1977), *cert. denied,* 434 U.S.

1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), and cases cited therein.

that minor acid drainage would have significant environmental impact.

Second, post-active mining discharges will be addressed and regulated by the renewal of the current five-year discharge permits and the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201 *et seq.,* and its implementing regulations, which require the control of water pollutant discharges from underground mines after mining operations cease. 30 U.S.C. § 1266(b); 30 C.F.R. § 817.42 (1981). SMCRA requires the posting of a performance bond which will not be released until the mine has been satisfactorily sealed and any state environmental laws and regulations are met. *See* 30 C.F.R. Part 784 (requiring underground mines to adopt a reclamation plan); Part 806 (requiring posting of a performance bond on reclamation); Part 807 (stipulating requirements for release of the bond). Moreover, post-mining discharges from a point source such as these mines are illegal in the absence of an NPDES permit, the conditions of which the owner of the property must meet. *Cf. Sierra Club v. Abston Construction Co.,* 620 F.2d 41, 42 (5 Cir.1980) (discharge from mining spoil piles must be by permit). If the technology to control post-mining drainage exists, and Webb does not contend it does not, the owner of the mines will be required to employ it.

■ Webb also argues that EPA acted arbitrarily by the failure to consider the cumulative impact of the five mines for which permits were granted and several other mines planned by Brooks Run within the mining complex. We think that the record demonstrates that EPA considered the cumulative impact of the five mines. In its Finding of No Significant Impact and an environmental assessment prepared by D'Appolonia, Inc., the mines are discussed in the aggregate, and the permits granted placed restrictions on the number and placement of the mines at the site. Any failure on the part of EPA to consider the potential impact of other planned mines at this time was not error, for the opening of the mines in consideration did not represent a practi-

cal commitment to the others. If and when other mines are to be opened, additional permits will be required, and the impact of them will be considered at that time. Generally, an administrative agency need consider the impact of other proposed projects when developing an EIS for a pending project only if the projects are so interdependent that it would be unwise or irrational to complete one without the others. *See, e.g., Sierra Club v. Froehlike,* 534 F.2d 1289, 1297–99 (8 Cir.1976); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285 (9 Cir.1974).

■ Finally, Webb contends that EPA failed to give sufficient consideration to alternative methods of mining which would cause less harm. The simple answer to this is that once EPA found the mines would have no significant environmental impact, it was under no statutory duty to consider alternatives to the proposed action. 42 U.S.C.A. § 4332(C). In any event, EPA asserts it did consider the alternative pressed by Webb—moving the entrance of the mine up the slope to prevent drainage—but found it impractical because Brooks Run did not own the necessary surface area and because of the difficulty of digging through the sandstone above the coal.

III.

■ Webb's other objections to the permits granted by EPA may be rejected summarily. First, EPA's failure to require biological monitoring was not arbitrary and capricious since the Clean Water Act gives EPA discretion to require such monitoring, and Webb has made no effort to show why the action here is an abuse of that discretion. 33 U.S.C.A. § 1318(a)(A)(iii). Second, EPA, in responding to Webb's comments, did not act arbitrarily or capriciously in relying upon data collected after the close of the comment period. The regulations, the validity of which Webb does not contest, explicitly permit EPA to add new material to the administrative record when responding to comments. 40 C.F.R. § 124.-17(b). Moreover, as a general matter, courts permit an agency to alter its position in reaction to comments or seek new evi-

dence without reopening the comment period. *Cf. BASF Wyandotte v. Costle,* 598 F.2d 637, 664–65 (1 Cir.1979), *cert. denied sub nom, Eli Lilly & Co. v. Costle,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980). Finally, EPA was under no duty to hold a public hearing. One was not timely requested by Webb or the only other party who responded to EPA's invitation for comments. Not only does the absence of a timely request for a public hearing suggest that there was insufficient interest to warrant such a hearing, *Cf. Costle v. Pacific Legal Foundation,* 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980) (hearing need only be held when there is significant public interest, absence of which is evidenced by lack of a request for a hearing), EPA's rules provide for a public hearing only on timely request. *See* 40 C.F.R. § 124.12.

### IV.

Because we see no grounds on which to disturb the action of EPA in granting the five permits in question, we will dismiss the petition for review.

PETITION DISMISSED.