CITY OF ALEXANDRIA, VIRGINIA, A Municipal Corp., The City Council of Alexandria, Virginia, A Body Politic, Appellants,

and

Board of Supervisors of Fairfax County, Virginia, Plaintiff,

v.

FEDERAL HIGHWAY ADMINISTRA-TION; Ray A. Barnhart, Administrator, Federal Highway Administration; Commonwealth of Virginia; Virginia Department of Highways and Transportation; Harold C. King, Commissioner, Va. Dept. of Highways; and Elizabeth Hanford Dole, Secretary of Transportation, U.S., Appellees.

No. 84–1349.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1985.

Decided March 11, 1985.

Jerry K. Emrich, Arlington, Va. (Walsh, Colucci, Malinchak, Emrich & Lubeley, P.C., Arlington, Va., Cyril D. Calley, Alexandria City Atty., Alexandria, Va., on brief), for appellants.

Albert M. Ferlo, Jr., Dept. of Justice, Washington, D.C. (James F. Hayes and E.

Suzanne Darling, Asst. Attys. Gen., F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Elsie L. Munsell, U.S. Atty., Alexandria, Va., Paula M. Potoczak, Asst. U.S. Atty., Dirk D. Snel, Dept. of Justice, Washington, D.C., on brief), for appellees.

Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

This appeal presents the issue of whether the Federal Highway Administration (FHWA) acted arbitrarily and capriciously in concluding that the Shirley Highway Traffic Management System was categorically excluded from the National Environmental Policy Act's requirements. We agree with the district court that FHWA's actions were not arbitrary and capricious and therefore affirm.

## I.

Shirley Highway (I–395) is a limited access divided highway that links some of the northern Virginia suburbs with Washington, D.C. and a part of which runs through the City of Alexandria. The highway has three standard lanes each northbound and southbound, but it also has two reversible lanes in the center, which carry northbound traffic during the morning rush period and southbound traffic during the afternoon rush period. The two center lanes are normally open only to high occupancy vehicles (HOV's), which are vehicles with four or more occupants. The entire highway is heavily traveled, but during peak periods the HOV lanes carry over twice as many persons at substantially greater speeds than do the standard lanes.

The Traffic Management System is designed to reduce congestion and travel times on the non-HOV lanes of Shirley Highway and on portions of I–66, which does not run through Alexandria. Most of the components of the system, such as widening access ramps, restriping the highway to create an additional traffic lane, and traffic surveillance and motorist advisory signs, are not challenged on appeal. The City's only complaint is with the entrance ramp metering system, which is a computerized system of traffic sensors and control lights that is designed to adjust the rate of flow on the entrance ramps to balance the highway and entrance ramp capacity with the demand of traffic to enter the highway. The total cost of the improvements on I–66 and Shirley Highway is about $20 million, and the cost of the ramp metering system alone on Shirley Highway is about $5 million. The FHWA provided 90% of the funds to the Virginia Department of Highways and Transportation (VDH & T), which will be responsible for operation and maintenance of the system. At the time of oral argument of this appeal all of the construction on the project was complete and the ramp metering system was only awaiting final computer programming and testing before it would be fully operational.

Planning for this project began in 1976, when the VDH & T commissioned a formal study of the traffic problems on Shirley Highway. The VDH & T then requested preliminary engineering and design funding from the FHWA based on that study's recommendations, and the project was discussed at meetings of the National Capitol Region Transportation Planning Board of the Washington Metropolitan Area Council of Governments (COG). The City of Alexandria is a member of the latter group, as well as of the Shirley Highway Steering Committee that was established to monitor the progress of the project after COG's May 1978 approval of it. Additional engineering and design studies were prepared in 1978 and 1979. In April of 1981 the VDH & T submitted air quality and noise studies to the FHWA. Based on these studies, the general plans, and an on-site inspection, in August 1981 the FHWA approved VDH & T's recommendation that no further environmental studies were required because the project qualified as a categorical exclusion under 23 C.F.R. § 771.115(b)(13) and (14).

The City voiced no objections to the project prior to its approval, presumably on the assumption that the system would not be operated so as to cause diversion of traffic from the highway onto local streets. By 1982 the City began to doubt representations to that effect, and city officials began making further inquiry about the actual diversionary effects and the extent to which the FHWA had considered those effects in approving the categorical exclusion. In the spring of 1983 the FHWA reviewed its previous decision approving the project as a categorical exclusion and adhered to that determination.

The City of Alexandria filed this action in district court on July 22, 1983, seeking a declaration that the FHWA violated the National Environmental Policy Act (NEPA) by not preparing an environmental impact statement or an environmental assessment for the Shirley Highway project and seeking to enjoin the defendants from operating the system until after they complied with the statute. Fairfax County brought a similar action that was consolidated with the City's suit in district court, but the County has not appealed. Since the administrative record filed with the district court was unilluminating on several important issues, the district court permitted and considered separate discovery materials.[1] On February 28, 1984, upon cross-motions for summary judgment, the district court held that the FHWA had not been arbitrary or capricious in declining to prepare an environmental impact statement and therefore dismissed plaintiffs' complaints. On May 18, 1984, the district court denied a motion for an injunction pending appeal, and, on the representation that the system would not be operational until February 1, 1985 at the earliest, we did likewise on December 21, 1984.

## II.

■ We consider first the City's argument that our standard of review of FHWA's action should be one of "reasonableness." Whenever agency action is subjected to judicial review under the Administrative Procedure Act, the standards of review specified by the statute remain precisely the same, and none of them mentions "reasonableness" other than in connection with inaction or delay. See 5 U.S.C. § 706. Our precedents indicate that the provision of that statute relevant to a nonadversarial decision not to prepare an environmental impact statement (EIS),[2] and therefore the standard that we apply, permits us to set aside agency conclusions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

That is the standard we employ in deciding this case. To apply the standard, we must make a "searching and careful" inquiry into the facts and a review of "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," although naturally we are "not empowered to substitute [our] judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). As a practical matter there is little difference between what we undertake and the "reasonableness" standard urged by the City.

## III.

The City first attacks the general validity of FHWA's regulations defining categorical exclusions and next, the application of

---

1. *See Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("If ... there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was ... to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."); *Webb v. Gorsuch,* 699 F.2d 157, 159 n. 2 (4 Cir.1983).

2. *See, e.g., Webb v. Gorsuch,* 699 F.2d 157, 159 (4 Cir.1983) ("EPA's determination that a contemplated action will have no significant environmental impact, and so does not require an EIS, will be sustained unless it is arbitrary and capricious."); *Providence Road Community Assn. v. EPA,* 683 F.2d 80, 82 (4 Cir.1982); *Rucker v. Willis,* 484 F.2d 158 (4 Cir.1973).

those regulations to the Shirley Highway project. The factual predicate for both contentions is that the ramp metering system will divert traffic from the highway onto local streets, or attract traffic from the HOV lanes onto the non-HOV lanes, and that the environmental effects of such diversion were not adequately considered prior to the project's approval.

## A.

 NEPA requires that federal agencies "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality (CEQ) has issued regulations implementing NEPA that are binding on all federal agencies, one of which provides that "[a]gencies shall reduce excessive paperwork by: ... (p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement." 40 C.F.R. § 1500.4 (1984). The CEQ further defines categorical exclusions in 40 C.F.R. § 1508.-4.[3]

Pursuant to these directions, the FHWA adopted its own definition of a categorical exclusion and developed a list of examples of such actions from among the types of projects frequently under its review. FHWA's general definition states:

Categorical exclusions are categories of action which do not involve significant environmental impacts or substantial planning, time or resources. These ac-

tions will not induce significant forseeable alterations in land use, planned growth, development patterns, or natural or cultural resources.

23 C.F.R. § 771.117(a) (1984). The specific categorical exclusions that relate to the Shirley Highway project are described as follows:

(13) Modernization of an existing highway by resurfacing, restoration, rehabilitation, widening less than a single lane width, adding shoulders, adding auxiliary lanes for localized purposes (e.g., weaving, turning, climbing), and correcting substandard curves and intersections. This classification is not applicable when the proposed project requires acquisition of more than minor amounts of right-of-way or substantial changes in access control.

(14) Highway safety or traffic operations improvements projects including the correction or improvement of high hazard locations; elimination of roadside obstacles; highway signing; pavement markings; traffic control devices; railroad warning devices; and lighting. This classification is not applicable when the proposed action requires acquisition of more than minor amounts of right-of-way or substantial changes in access control.

23 C.F.R. § 771.115(b)(13)—(14) (1984).

The City seizes upon the words "do not" and "may" that are italicized in note 3 and FHWA's parallel use of those terms in 23 C.F.R. § 771.117(a) and .115(a) and argues that FHWA's list of categorical exclusions is invalid since a project *may* have a significant environmental impact and yet be excluded by that list. We do not agree, because we can perceive no material difference between the CEQ and FHWA regulations nor any inconsistency between either

---

**3.** "Categorical exclusion" means a category of actions which *do not* individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is re-

quired. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action *may* have a significant environmental effect.

40 C.F.R. § 1508.4 (1984) (emphasis added).

of them and the statutory standard they implement. If any difference exists, FHWA's regulations are perhaps more stringent, since they refer to "significant environmental impacts *or* substantial planning, time or resources," § 771.117(a) (emphasis added), while CEQ's regulations do not mention the latter factor, and NEPA does not clearly make "major" a disjunctive requirement in its mention of "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C). Moreover, FHWA's regulations establish an exception which accomplishes what the City seeks:

> (c) The Administration may determine that any action proposed as a categorical exclusion may, because of extraordinary circumstances, require appropriate environmental studies to establish the need for an EIS. Extraordinary circumstances includes situations that are *likely* to involve:
>
> > (1) Significant impacts on the environment;
> >
> > (2) Substantial controversy on environmental grounds....

23 C.F.R. § 771.117(c) (1984) (emphasis added). Again, we perceive no material difference between this regulation and the CEQ guidelines.

### B.

The City challenges application of the above categorical exclusions on the grounds that the Shirley Highway ramp metering project will involve "substantial changes in access control," that it is likely to or may involve "significant impacts on the environment," and that it involves "substantial planning, time or resources."

■ The categorical exclusions at issue appear to apply precisely to the Shirley Highway project, since it involves "modernizing an existing highway by ... widening less than a single lane width," and is basically a "traffic operations improvement"

project involving "highway signing, pavement markings, [and] traffic control devices." Nevertheless, the City contends that the ramp metering portion of the project will involve "substantial changes in access control" because it will restrict access to the non-HOV lanes. Whether or not such a change will actually occur, it does not appear to be the type of access control contemplated by FHWA's regulations. The environmental regulations themselves do not define access control, but FHWA's general definitions adopt the industry definition promulgated by the American Association of State Highway and Transportation Officials, *see* 23 C.F.R. § 625.3(a)(2), (e)(1), and that definition refers to physical changes in control as to abutting landowners, not to changes in pattern of use by the highway traffic itself.[4] Thus there is nothing in the listed categorical exclusions themselves that precludes their application here.

The City next argues that FHWA's general definition of a categorical exclusion precludes application of the specific listed examples, since this project involved "substantial planning, time or resources." 23 C.F.R. § 771.117(a). The City argues that "[t]o conclude that 5 years of planning, 2 years of construction and $5,000,000 is not substantial when a project of this type involves the second busiest highway in the country is plainly wrong." The City also argues that this factor was not given independent consideration when the FHWA approved the categorical exclusion for Shirley Highway.

■ We think that the more specific examples of categorical exclusions listed in the regulations, rather than a party's or our own notions of substantiality, give adequate meaning to the general definition. As the district court noted, this type of project fits within FHWA's three categories of included, excluded, and uncertain projects in approximate relation to the

---

**4.** Access control is defined in both adopted documents as:

> The condition where the right of owners or occupants of abutting land or other persons to

access, light, air or view in connection with a highway is fully or partially controlled by public authority.

amount of planning, time and resources involved. That scheme of three types of actions demonstrates what the FHWA meant by "substantial planning, time or resources." So long as no project required to be included under the statute is excluded under the regulations,[5] we should defer to the agency's interpretation of its own regulations. *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Ashland Exploration, Inc. v. FERC,* 631 F.2d 1018, 1021–23 (D.C.Cir. 1980), *cert. denied,* 450 U.S. 915, 101 S.Ct. 1358, 67 L.Ed.2d 340 (1981).

The City's major argument throughout has been that the ramp metering system may cause significant environmental impacts and that these impacts were insufficiently studied by the FHWA before approving a categorical exclusion for the Shirley Highway project. As FHWA's own regulations provide, an action proposed as a categorical exclusion (CE) may require "appropriate environmental studies" if it is likely to involve significant impacts on the environment. 23 C.F.R. § 771.117(c). The City argues that the ramp metering system will divert traffic from the non-HOV lanes to local streets, and that the increased speeds on the non-HOV lanes will attract traffic from the HOV lanes, both with a possibly significant impact on the environment by altering air and noise pollution.

██ The parties agree that the ramp metering system could be operated in a diversionary manner, i.e. that the entrance rate may be set low enough to cause cars to back up on the ramp and the drivers to become frustrated and go elsewhere, but they also agree that the VDH & T intends to operate the system in a non-diversionary manner. The City's contentions are that "the state's alleged non-diversionary method of operation will cause diversion," and that such an effect "is based on facts available prior to the CE determinations." The system apparently does have the capacity to be operated in a fully non-diversionary manner, since the metering rates may be progressively increased if the entrance ramp remains full and the system may be temporarily turned off during peak periods if it is unable to accommodate demand. VDH & T's expressed intention to operate the system in a non-diversionary manner is bolstered by the fact that all the studies of the project concluded that there are inadequate alternate routes through the City to handle diverted traffic and thus the system would have to be operated in such a manner. Based on these conclusions and recommendations, VDH & T's expressed intention, and the other known facts concerning the project, it was not arbitrary or capricious for the FHWA to conclude that the system would be operated in a non-diversionary manner so as to avoid any significant impacts on the environment.[6]

---

**5.** This project may well meet the statutory definition of "major" Federal action. *See Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 698 (2 Cir.1972) ($14 million viaduct project, of which federal share is 60%, is clearly major action); *Hanly v. Mitchell,* 460 F.2d 640, 644 (2 Cir.) (government conceded that $20 million building project was major federal action), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept.,* 446 F.2d 1013, 1025 (5 Cir.1971) (court had no difficulty in characterizing a highway project with initial costs of $12.6 million (50% federal share) and projected ultimate costs of $18 million as major), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972); *cf. Sierra Club v. Hassell,* 636 F.2d 1095, 1099 (5 Cir.1981) (It would not be unreasonable to classify a $30 million bridge project that required

two years of construction as "major action"). Nevertheless, the statute also requires that the major federal action "significantly affect the quality of the human environment," and while a significant environmental impact might also qualify the action as major, the reverse is probably not true. *See generally Mont Vernon Preservation Society v. Clements,* 415 F.Supp. 141, 146–47 (D.N.H.1976); *cf. Andrus v. Sierra Club,* 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979) (annual appropriations requests do not require preparation of an EIS). We address the environmental impact claim later in the text.

**6.** Our review of agency action must be directed at the facts available to the agency at the time of its decision, *see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 554–55, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978), although in this case we do

■ The City's main argument against this conclusion is that two reports before the FHWA indicated that there would be some traffic diversion as a result of the improvements on Shirley Highway. One consultant's memorandum indicated that at peak hours 200 to 250 vehicles per hour might be diverted onto local streets, but this diversion was of local origin and destination traffic only, i.e. intracity traffic. Also, noise pollution and air quality studies conducted by the state assumed that up to 5,000 vehicles per day would be diverted from Shirley Highway by the year 2005.

In our view these reports provide some support for the City's argument that traffic may be diverted from Shirley Highway, but they fall short of establishing that the FHWA acted arbitrarily and capriciously. First, the FHWA considered these studies before it approved the Shirley Highway project as a categorical exclusion. There is no clear error in FHWA's decision that diverting some local traffic or less than 5% of the daily traffic on the highway is not a significant change requiring further study. Second, the air and noise studies that incorporated these assumptions found that there would be no significant impact on the environment. Thus this is not a case in which an agency has decided that environmental concerns are outweighed by other factors, as is permitted under NEPA. Rather, it is a case in which the agency considered environmental factors and found them to be insubstantial. In the absence of identification of other environmental effects that were ignored by the FHWA, we cannot deem the instant decision arbitrary or capricious.

■ The City also argues that the FHWA inadequately considered the possibility that the improvements on the non-HOV lanes would make travel on them more attractive to HOV traffic, thereby detracting from the environmental advantages of group travel. This possibility admittedly did not receive as much attention as the diversion issue, but we believe it was adequately considered by the FHWA. We think that the factual premise of this argument is difficult to understand. If, as the City claims, the ramps will be so backed up by the metering system that traffic is being diverted to local streets, it is hard to imagine HOV occupants switching from their smooth-flowing 55 mph travel to congested travel in non-HOV lanes. Nevertheless, the City points to the claims of the system's proponents that travel time on the non-HOV lanes will be reduced 25–37% and that travel speed will be increased to 30–50 mph from the current stop-and-go to 30 mph. The responsible FHWA official did not consider these precise figures before he granted approval for the categorical exclusion, but he did consider the speed differences between the HOV and standard lanes, and, based on personal observation and the studies submitted in connection with the project, he concluded that there would be no significant decrease in the use of HOV lanes as a result of the project. Thus, it is clear that the FHWA considered this factor, and there is lacking persuasive evidence that its conclusion was incorrect. We therefore conclude that it did not act arbitrarily in deciding not to conduct further environmental studies with regard to this factor.

### IV.

The FHWA urges us to decide that the City's action, filed on the eve of completion of the project despite full notice of each step to carry it out, is barred by laches. Given our conclusions on the merits, we

---

not think the facts have changed since 1981 in a way that would affect our review of FHWA's determination that the project would have no substantial environmental impact. Nevertheless, the responsible FHWA official stated that a categorical exclusion would not have been proper if the VDH & T intended to operate the ramp metering system in a diversionary manner, and

we note that under some circumstances a significant proposed change in an ongoing project or operation may itself require preparation of an environmental impact statement. *See Virginians for Dulles v. Volpe,* 541 F.2d 442 (4 Cir. 1976); *Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271 (3 Cir.1983).

find it unnecessary to express any view on this defense.

AFFIRMED.