**LAKE WYLIE WATER RESOURCES PROTECTIVE ASSOCIATION, Plaintiff,**

**v.**

**RODGERS BUILDERS, INC.; and the U.S. Army Corps of Engineers, Defendants.**

**Civ. A. No. 85–856–15.**

United States District Court, D. South Carolina, Rock Hill Division.

Oct. 21, 1985.

James S. Chandler, Jr., Columbia, S.C., for plaintiff.

T.L. Williams, Lake Wylie, S.C., Glen Craig, Asst. U.S. Atty., Columbia, S.C., E.J. Colbert, and Stan Barnett, Asst. Dist. Counsel for U.S. Corps of Engineers, Charleston, S.C., for defendants.

## ORDER

HAMILTON, District Judge.

The plaintiff, an unincorporated association of property owners, brought this action to prevent the defendant Rodgers Builders, from conducting dredging opera-

---

tions and constructing a boat docking facility for ten boats at Lake Wylie in Clover, South Carolina. Plaintiff originally claimed violations of the Federal Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, arising from Rodgers Builders' failure to obtain all requisite state and federal permits. Plaintiff further alleged that neither Rodgers Builders, nor any appropriate governmental body, had prepared an environmental impact statement (hereinafter "EIS") as purportedly required by law. *See* the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (hereinafter "NEPA"). Although this court originally entered a preliminary injunction restraining Rodgers Builders from continuing operations because the appropriate permits had not yet been obtained, on August 27, 1985, this court dissolved the preliminary injunction on the ground that, by that date, all necessary permits had been obtained.[1] Also on August 27, 1985, the court granted plaintiff leave to amend its complaint to name the United States Army Corps of Engineers (hereinafter "Engineers") as a party defendant. The plaintiff alleged that the Engineers erred in issuing a permit without the preparation of an EIS. On the same date, Rodgers Builders moved for summary judgment. The court concluded, however, that Rodgers Builders' motion should be held in abeyance until the Engineers had been served and could participate in the litigation on the merits of the suit.

On September 13, 1985, the plaintiff filed a motion for preliminary injunction to restrain Rodgers Builders from proceeding with dredging and construction operations until a final determination of this lawsuit. *See* Fed.R.Civ.P. 65(a). Basically, the plaintiff argues that because the permit issued by the Engineers was allegedly issued without compliance with NEPA, the permit is invalid. Further, counsel for plaintiff advised this court on October 8, 1985, that Rodgers Builders had already resumed dredging and construction activities.[2] The plaintiff thus argues that its members will suffer irreparable injury if further construction activities are not enjoined. On September 26, 1985, the defendant Engineers submitted its memorandum in opposition to plaintiff's motion for preliminary injunction.[3] The Engineers contend that it fully complied with NEPA, and all applicable regulations, in issuing the permit to Rodgers Builders. This court held a hearing on plaintiff's motion for a preliminary injunction on October 11, 1985.

Notwithstanding that the court has been informed that the dredging and construction activities at issue here may have reached an advanced stage of completion, the court concludes that this does not render plaintiff's motion for a preliminary injunction moot. This court retains the equitable power to order the removal of all offending materials should plaintiff prevail on its motion for a preliminary injunction. *See Richland Park Homeowners Association v. Pierce,* 671 F.2d 935 (5th Cir.1982); *Columbia Basin Land Protection Association v. Schlesingner,* 643 F.2d 585 (9th Cir.1981). In *Columbia Basin* the court concluded that although towers and electric transmission lines had been in operation for several years, the responsible agency might still have to correct the decision-making process and remove the lines if the court found the EIS to be inadequate. Thus, this court will proceed to review the merits of plaintiff's motion.

In this circuit the standard for interlocutory injunctive relief is the "balance-of-hardship" test set out in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 196 (4th Cir.1977). This test

---

1. On July 15, 1985, the United States Army Corps of Engineers issued its final permit allowing Rodgers Builders to proceed with construction. By this date, all required state permits had been obtained as well.

2. Plaintiff's counsel further advised this court that by October 11, 1985, the work of driving piles into the lake for the boat slips had been virtually completed.

3. The government's 60 days for answering has not yet elapsed. Therefore, the Engineers' memorandum in opposition represents its first appearance in this suit.

requires a "flexible interplay" among four factors: the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; the likelihood of harm to the defendant if the requested relief is granted; the likelihood that plaintiff will succeed on the merits; and the public interest. The award of a preliminary injunction is, however, an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought. *Federal Leasing v. Underwriters of Lloyds*, 650 F.2d 495 (4th Cir.1981).

*Blackwelder* directs that this court's first task is to balance the likelihood of irreparable harm to the plaintiff against the likelihood of harm to the defendant. *Id.* at 196. "If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." *Id.* Conversely, a weaker showing of irreparable injury to the plaintiff will necessitate a stronger showing of probability of success; and if irreparable injury is merely "possible," probability of success may be decisive. *Id.* at 195–96.

█ In determining whether this project poses the requisite irreparable injury to the plaintiff's members, or indeed to the environment, this court is mindful of plaintiff's counsel's own admission, in arguing the mootness aspect, *see ante*, that the completed work could be undone if necessary. Thus, plaintiff's protestations of great and imminent irreparable injury are undercut somewhat when considered against the facility with which this project could be reversed. This court also notes the relatively small magnitude of the operation here; the proposed operation is to accommodate only ten boats. Further, in assessing the degree of irreparable injury threatening plaintiff, this court cannot ignore the re-

ports of the various federal and state agencies, detailed below, that the proposed project would not significantly affect the environment. Thus, the court is hard pressed to find considerable support for plaintiff's claims of irreparable injury.

There is evidence that the issuance of the preliminary injunction threatens injury to the defendant Rodgers Builders. The affidavit of T.L. Williams, attached to Rodgers Builders' memorandum in opposition to plaintiff's motion, states that the issuance of a preliminary injunction will prevent the sale of slips, thereby causing Rodgers Builders to suffer either a loss or reduced return on monies borrowed to finance construction of the boat slips, and adversely affect sales of the remaining unsold condominium units.[4] Moreover, the proposed project has already been delayed for three months after the relevant state and federal permits had been obtained.[5] Thus, this court must reject plaintiff's argument that the preliminary injunction would cause no perceptible harm to Rodgers Builders.

The foregoing review of the relative probabilities of harm to the individual litigants fails to indicate that the balance of hardships tips decidedly in plaintiff's favor. Rather, this court is of the opinion that the irreparable injury to the plaintiff here is only merely "possible." Accordingly, under *Blackwelder* the court must now consider two other factors, i.e., plaintiff's probability of success on the merits of the underlying dispute, and the public interest.

In apprising the plaintiff's likelihood of success in proving that the Engineers' actions did not comport with NEPA, this court is mindful of the very narrow scope of review over agency actions. The Supreme Court has recognized that

[n]either [NEPA] nor its legislative history contemplates that a court should sub-

---

**4.** Apparently seven of the slips are to be sold to individual unit owners while three of the slips will be reserved for the use of all members of the condominium association. Mr. Williams further states that the pendency of this action will depress the sales prices of the remaining units.

**5.** The court notes, however, that the excavation work may have been delayed a slightly shorter period of time since one of the conditions imposed by the S.C. Wildlife & Marine Resources Department (SCWMRD) limited dredging to the period between September 1–April 10, in order to avoid the peak fish spawning season.

stitute its judgment for that of the agency as to the environmental consequences of its actions. The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). Thus, the appropriate standard of review over the Engineers' action is whether the agency's actions were arbitrary, capricious or an abuse of discretion. *See Maryland Wildlife Federation v. Dole,* 747 F.2d 229 (4th Cir.1984); *Webb v. Gorsuch,* 699 F.2d 157 (4th Cir.1983); *Providence Road Community Association v. EPA,* 683 F.2d 80 (4th Cir.1982). Although NEPA requires "a detailed statement for all major federal actions significantly affecting the quality of the human environment, 42 U.S.C. § 4332(2)(C), it is well settled that for projects that do not significantly affect the environment, the shorter, less comprehensive Environmental Assessment (hereinafter "EA") may suffice.[6] Generally a decision not to prepare an EIS is left to the informed discretion of the agency. *Providence Road Community Association v. EPA,* 683 F.2d at 82.

This court has carefully examined the Administrative Record against the relevant regulations to determine if the Engineers complied with the regulations. The purpose and format of an EA is described in 33 C.F.R. § 230.9,

[a]n EA is a brief document which provides sufficient information on potential environmental effects of the proposed action and its alternatives, to the district engineer, to determine if an EIS is required and to assist the district engineer in complying with NEPA whether or not an EIS is necessary.

. . . .

[w]hile no special format is required, the EA should include a brief discussion of the need for the proposed action, its environmental impacts, alternatives to the proposed action, and a list of the agencies, interested groups, and the public consulted. The document . . . is to be concise for meaningful review (should not normally exceed 15 pages)

. . . .

The regulations also provide for the information from the EA to be summarized in a Finding of No Significant Impact (hereinafter "FONSI"), as detailed in 33 C.F.R. § 230.10.

A FONSI shall be prepared . . . to accompany an EA prepared for a proposed action when, as a result of the analysis included in the EA, it is concluded that the proposed action will not have significant effects on the environment. The FONSI will be based on the information analyzed in the EA, reflecting pertinent data . . . It shall briefly present the reasons why the action will not have a significant impact on the quality of the human environment and state that an EIS is not required.

In this proceeding the plaintiff has repeatedly argued that the Engineers performed only a "checklist" review of the project here. Plaintiff points to a one-page document, which it considers to be the EA. *See* Plaintiff's Motion for a Preliminary Injunction, Exhibit A. Such an argument ignores the more voluminous, detailed reports to be found in the Administrative Record, and which are integrated with the

---

**6.** NEPA provides that the decision to prepare an EA or an EIS is to be made according to the regulations of individual agencies. NEPA directs each federal agency to adopt procedures in consultation with the Council on Environmental Quality (CEQ) for implementing the NEPA requirements. 40 C.F.R. § 1507.3(a).

Pursuant to NEPA and the CEQ's implementing regulations, the Army Corps of Engineers adopted policies and procedures for implementing NEPA. 33 C.F.R. part 230 *et seq.* Under

these procedures, the Corps must prepare an EA for any proposed action. The EA is intended to be brief and to the point. The overall aim of the EA is to determine whether the preparation of a more exhaustive EIS is necessary for the particular case. The standard for determining whether a proposal requires an EIS in addition to an EA is whether the action will have a significant effect on the human environment. 42 U.S.C. § 4332(C).

one-page document. Thus, this court concludes that the "District Engineer's Statement of Findings," Administrative Record Item 5, conforms to the requirements established for an EA in 33 C.F.R. § 230.9, and should be considered the EA in this case, and the one-page checklist document found at the end of Item 5, should be considered the FONSI.

The District Engineer's Statement of Findings, or EA, reported that comments had been solicited and received from numerous federal and state agencies.[7] The South Carolina Department of Health and Environmental Control, whose water quality standards are conclusive under the federal act, issued the required water quality certificate. Objections originally voiced by the South Carolina Wildlife & Marine Resources Department were addressed, and five separate conditions were imposed on the permit issued by the Engineers.[8] Further, the District Engineer addressed the specific concern of the local residents, as expressed in the 26 letters received by him. Basically, the District Engineer concluded

that the proposed facility would not decrease safety, increase shoreline erosion, or threaten wildlife. For each of these conclusions, the District Engineer provided findings and reasons supporting his conclusions. Finally, the District Engineer concluded that there were "no reasonable alternatives available to the applicant that will achieve the purposes for which the work is being constructed."[9] Based on his consideration of all these factors, as well as the public interest, the District Engineer concluded that the proposed facility would not significantly affect the human environment, and therefore, would not require an EIS.

In reviewing the Administrative Record this court has carefully examined the record to determine that a real give and take was fostered on the key issues. This court does not have a license to engage in the microscopic determination of how much weight should be assigned to the scientific and technical data, a task for which it is ill suited and which has been committed by Congress to the appropriate agency. Be-

---

**7.** Comments received from the U.S. Dept. of Interior, Fish and Wildlife Service, and the U.S. Dept. of Commerce, National Oceanic and Atmospheric Administration indicated that the proposed project would not pose significant environmental impacts.

**8.** These five conditions were:

(1) That the proposed excavation be limited to the removal of the silt build-up resulting from erosion of the land on the adjacent development site. The area to be excavated is generally located between profiles A and D, and should extend no further channelward than the edge of the dock and no lower than an elevation of 565 feet mean sea level (see attached drawings).

(2) That the excavation be conducted during the period—September 1 to April 10—to avoid the peak fish spawning season.

(3) That all spoil material be placed on highland and stabilized.

(4) That every effort be made to minimize erosion and sedimentation from the proposed excavation and adjacent construction activities.

(5) That upon completion of the work, all disturbed land surfaces be permanently stabilized with rip-rap or vegetation as appropriate.

**9.** Plaintiff has attempted to argue that the Engineers' report was deficient in failing to specifically address the existence of a 350 boat marina

within walking distance of the proposed facility. For the several reasons that follow, this argument has no merit. First, 33 C.F.R. Part 230, App. B(8)(a) indicates that the consideration of alternatives may be less detailed for water dependent activities. Second, the District Engineer stated that no other facility could "achieve the purposes" of the proposed facility. The purposes of the ten boat slips are twofold: (1) to generate income to Rodgers Builders from the sale of the slips, and (2) to enhance sales of the condominiums by providing both private-owner and shared-unit slips *on the premises, see* note 4, *infra.* Even if it is assumed that the 350 boat marina is not already filled to capacity, for which there is no evidence in the record, it is obvious that this alternative facility could never meet the twin objectives of the on site slips. Thus, the District Engineer recognized that, in practical terms, there was no comparable alternative available.

Moreover, although this factor did not arise during oral argument, the fact that the area of concern here is already host to a marina that is larger but similar in design to the proposed facility indicates that the Engineers' permit did not introduce a previously non-existent use into the area. The Fourth Circuit has recognized that this is one factor supporting a finding of no significant impact on the human environment. *Rucker v. Willis,* 484 F.2d 158, 163 (4th Cir. 1973).

cause this court concludes that the Engineers' decision was based on a consideration of relevant factors, and complied in all material respects with NEPA and the regulations promulgated thereunder, this court cannot find that the Engineers' actions were arbitrary or capricious. In reaching this conclusion, the court draws support from two cases in which the Fourth Circuit, applying the arbitrary or capricious standard, affirmed the adequacy of an EA for projects considering more extensive and controversial than the instant facility. *Webb v. Gorsuch*, 699 F.2d 157 (4th Cir. 1983); *Providence Road Community Association v. EPA*, 683 F.2d 80 (4th Cir. 1982). Accordingly, the court must assess the plaintiff's likelihood of success on the merits as remote.

The final *Blackwelder* factor of public interest was also considered in the EA, and found to favor proceeding with the construction activity. This court would remind plaintiff that "public interest" includes not only the interests of plaintiff's members, but also the interests of the condominium residents, and their guests, who would benefit from the proposed facility. Based on a careful consideration of the above factors and the cited authorities, the court concludes that plaintiff's motion for a preliminary injunction must be denied.